STATE OF NORTH CAROLINA v. HARRY EUGENE GRIMMETT

No. 8126SC387

(Filed 17 November 1981)

**Searches and Seizures §§ 10, 13— detention of suspect justifiable—search and seizure of controlled substances pursuant to consent**

> The trial court's denial of defendant's motion to suppress evidence of cocaine was proper where the evidence showed that, based upon an officer's conclusion defendant's "behavior pattern" fell within the "drug courier profile," the officer approached defendant outside an airport terminal, identified himself, stated the purpose of his approach, and asked defendant if he would talk with him; that defendant agreed to talk with the officer, agreed to accompany the officer into the terminal, agreed to produce identification from his companion's luggage and consented to move with the officer to the basement area of the terminal; that in the basement, defendant consented to the search of the suitcase containing his identification and identified a substance in the suitcase as a controlled substance; and that upon defendant's subsequent arrest and search of defendant's person, the officer found two bags of cocaine in defendant's boot. Upon these facts, even though there was a seizure of defendant without a reasonable and articulable suspicion of criminal activity after the initial encounter within the meaning of the Fourth Amendment, the detention was justifiable as defendant accompanied the officer "voluntarily in a spirit of apparent cooperation." Further, the evidence supports the court's finding that the consent to search the suitcase was given voluntarily and once defendant identified the substance in the suitcase as a controlled substance, the officer had probable cause to arrest defendant and the subsequent search of defendant's person was incident to a lawful arrest.

APPEAL by defendant from *Thornburg, Judge*. Order entered 9 October 1980 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 12 October 1981.

On 7 February 1980, the defendant, Harry Eugene Grimmett, a commercial airline passenger, was questioned by law enforcement officers at Douglas Municipal Airport in Charlotte, North Carolina, based on the officers' conclusion that his "behavior pattern" fell within the "drug courier profile."[1] As a result of a

---

1. "Since 1974, the federal Drug Enforcement Administration has assigned agents to certain airports as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed 'drug courier profiles' describing the characteristics generally associated with narcotics traffickers, and travelers with some of those characteristics are occasionally stopped at these airports for further investigation." 3 W. LaFave, Search & Seizure; A Treatise on the Fourth Amendment, § 9.3 (Supp. 1981).

subsequent search of his person, Grimmett was charged with possession of one gram or more of cocaine. Grimmett's attorney filed a Motion to Suppress the cocaine, and a suppression hearing was held on 6 October 1980. From an Order denying his Motion to Suppress, Grimmett gave notice of appeal. Thereafter, Grimmett pleaded guilty to the charged offense, reserving his right to submit for appellate review the Order denying his suppression motion.

*Attorney General Edmisten, by Associate Attorney G. Criston Windham, for the State.*

*Lila Bellar, for defendant appellant.*

BECTON, Judge.

We must determine (1) whether Grimmett was seized within the meaning of the Fourth Amendment; (2) if a seizure occurred, whether a reasonable and articulable suspicion of criminality existed at the time of the seizure; (3) whether Grimmett voluntarily consented (a) to accompany the law enforcement officers inside the terminal, and (b) to the search of his belongings; and (4) if Grimmett gave his consent after he was illegally seized, whether the search of his belongings was the tainted product of the illegal seizure and rendered inadmissible the cocaine seized from his person.

Grimmett contends (1) that the profile traits he allegedly exhibited provided neither probable cause to arrest him nor a reasonable and articulable suspicion that he was engaged in criminal activity; and (2) that even if the initial stop by the officers was justifiable, the officers, nevertheless, deepened the intrusion and effectively took him into custody by requesting that he accompany them to their basement office so as to render illegal the subsequent search of his belongings and person. We reject these contentions, and affirm the order of the trial court.

I

Grimmett was first observed by Special Agent J. A. Davis of the State Bureau of Investigation, and Officer D. R. Harkey of the Charlotte Police Department on 4 February 1980 at the Eastern Airlines ticket counter at Douglas Municipal Airport. Grimmett and his companion, Randy Huss, appeared to be "in a big hurry"

to catch their flight. An Eastern Airline ticket agent informed Davis that Grimmett and Huss had purchased their tickets with cash, that they were travelling to Daytona Beach, Florida, and that they were ticketed to return on 5 February 1980.

Grimmett did not return to Charlotte until 7 February 1980. On this occasion he was observed by Davis and Harkey leaving Eastern Airlines' baggage pick-up area. The officers had not seen Grimmett deplane, nor had they observed him as he moved from the concourse to the baggage area. When first observed, Grimmett was approximately five to eight feet behind Huss and a female friend of Huss' who had met Huss in the baggage pick-up area. As Huss and his female friend exited the terminal building, Huss was stopped by Davis. Simultaneously, Grimmett was stopped by Harkey.

Upon approaching Grimmett, Harkey identified himself and informed Grimmett that he was conducting a narcotics investigation. Grimmett appeared extremely nervous. Harkey then requested, first, to talk with Grimmett; second, that Grimmett give him some identification; and third, that Grimmett accompany him inside the terminal to continue their conversation. Grimmett assented to all requests and was first led to the airport police office about twenty feet away. Because that office was crowded, Grimmett was then led downstairs, approximately 150 feet, to a hallway outside a room the officers were using as an office. There, Grimmett opened the suitcase that the officers had taken from Huss and produced identification. When asked by Officer Harkey if he were carrying contraband, Grimmett said, "No, go ahead and search the suitcase if you want to." In the suitcase a tinfoil package was discovered, and Grimmett was asked what it contained. He replied, "Crystal Meth," (a street name for a controlled substance). Grimmett was then placed under arrest and searched. Two bags of cocaine were found in his boot.

II

Two cases involving the "drug courier profile" have reached the United States Supreme Court. The facts in *United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed. 2d 497, 100 S.Ct. 1870 (1980)

are strikingly similar to the facts in the case *sub judice*.[2] Ms. Mendenhall's alleged behavior pattern fell within the "drug courier profile," and she was, therefore, stopped and asked if she would talk to Drug Enforcement Administration (DEA) agents. She agreed to talk with the agents and was then taken to a DEA office and questioned. She later consented to a search. Grimmett's actions so closely parallel those of Ms. Mendenhall that one might think *United States v. Mendenhall* is totally dispositive of the issues we now address. A more thorough analysis of *Mendenhall*, however, convinces us that it is only dispositive of the consent issue which we address in Part V, *infra*; it does not resolve the "seizure" and "reasonable and articulable suspicion" issues.

*United States v. Mendenhall* is inapposite for two reasons. First, the "seizure" issue in *United States v. Mendenhall* was not raised until the case reached the Supreme Court, and, consequently, a majority of the Members of the Court *assumed* Ms. Mendenhall was "seized."[3]

Second, the suggestion in *United States v. Mendenhall* that behavior consistent with the "drug courier profile" provides DEA

2. Indeed, almost all airport search cases based on the drug courier profile have interestingly similar facts. For example, *see Reid v. Georgia*, 448 U.S. 438, 65 L.Ed. 2d 890, 100 S.Ct. 2752 (1980); *State v. Cooke*, 54 N.C. App. 33, 282 S.E. 2d 800 (1981); *United States v. Herbst*, 641 F. 2d 1161 (5th Cir., Unit B, 1981); *United States v. Berry*, 636 F. 2d 1075 (5th Cir. 1981); *United States v. Pulvano*, 629 F. 2d 1151 (5th Cir. 1980); *United States v. Robinson*, 625 F. 2d 1211 (5th Cir. 1980); *United States v. Vasquez-Santiago*, 602 F. 2d 1069 (2nd Cir. 1979), *cert. denied* 447 U.S. 911, 447 L.Ed. 2d 911, 100 S.Ct. 2998 (1980); *United States v. Elmore*, 595 F. 2d 1036 (5th Cir. 1979), *cert. denied* 447 U.S. 911, 64 L.Ed. 2d 861, 100 S.Ct. 2998 (1980); *United States v. Ballard*, 573 F. 2d 913 (5th Cir. 1978); *United States v. McCaleb*, 552 F. 2d 717 (6th Cir. 1977).

3. Justice Stewart, in a portion of the majority opinion (Part IIA) that only Justice Rehnquist joined, determined that Ms. Mendenhall had *not* been "seized." Justice Powell, with whom the Chief Justice and Justice Blackmun joined, concurred in the judgment but assumed that the stop of Ms. Mendenhall constituted a "seizure" and believed "that the federal agents had reasonable suspicion that [Ms. Mendenhall] was engaged in criminal activity . . . ." 446 U.S. at 560, 64 L.Ed. 2d at 513, 100 S.Ct. at 1880. The dissenting Justices White, Brennan, Marshall and Stevens, felt that Ms. Mendenhall had been "seized" and that the federal agents were not justified in seizing her. Mr. Justice White begins the dissenting opinion thusly:

The Court today concludes that agents of the Drug Enforcement Administration (DEA) acted lawfully in stopping a traveler changing planes in an airport terminal and escorting her to a DEA office for a strip search of her person.

agents with a reasonable and articulable suspicion of criminality has been substantially undermined by *Reid v. Georgia,* 448 U.S. 438, 65 L.Ed. 2d 890, 100 S.Ct. 2752 (1980). Significantly, thirty-four days after its decision in *United States v. Mendenhall,* the Supreme Court considered an almost identical factual situation in *Reid v. Georgia* and determined, with only Justice Rehnquist dissenting, that the DEA agents in *Reid v. Georgia* did not have a reasonable and articulable suspicion that criminal activity was afoot.

## A.

Because airport search cases based on the "drug courier profile" must be considered on a case by case basis, and because *United States v. Mendenhall* is not totally dispositive, we consider the following general principles in determining whether Grimmett was "seized" when he was first approached and questioned by Harkey.

### 1. *Police Questioning*

"There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry v. Ohio,* 392 U.S. 1, 34, 20 L.Ed. 2d 889, 913, 88 S.Ct. 1868, 1886 (1968) (White, J., concurring). Indeed, it is the governmental interest in effective crime prevention and detention that allows law enforcement officers in appropriate circumstances and in an appropriate manner to direct questions to citizens, even though there is no probable cause for an arrest. 392 U.S. at 22, 20 L.Ed. 2d at 906, 88 S.Ct. at 1880. And while it may be "an act of responsible citizenship for individuals to" cooperate with law enforcement officers, *Miranda v. Arizona,* 384 U.S. 436, 477-78, 16 L.Ed. 2d 694, 725-26, 86 S.Ct. 1602, 1629-30 (1966), a citizen may refuse to cooperate and go his way. That is, "the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." 392 U.S. at 34, 20 L.Ed. 2d at 913, 88 S.Ct. at 1886 (White, J., concurring).

---

This result is particularly curious because a majority of the Members of the Court refuse to reject the conclusion that Ms. Mendenhall was "seized," while a separate majority declined to hold that there were reasonable grounds to justify a seizure.

446 U.S. at 566, 64 L.Ed. 2d at 517, 100 S.Ct. at 1883.

## 2. *Seizures*

Our Constitution prohibits investigatory seizures. "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment." *Davis v. Mississippi*, 394 U.S. 721, 726, 22 L.Ed. 2d 676, 680, 89 S.Ct. 1394, 1397 (1969). "[W]henever a police officer accosts an individual *and restrains his freedom to walk away*, he has 'seized' that person." 392 U.S. at 16, 20 L.Ed. 2d at 903, 88 S.Ct. at 1877 (emphasis added). And, even though an intrusion upon the personal security of a citizen stops short of a "technical arrest," the Fourth Amendment requires that the intrusion be reasonable. *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L.Ed. 2d 607, 95 S.Ct. 2574 (1075); *Terry v. Ohio.* The reasonableness requirement for seizures that are less intrusive than traditional arrests are (a) that they be supported by articulable and objective facts, *Brown v. Texas*, 443 U.S. 47, 61 L.Ed. 2d 357, 99 S.Ct. 2637 (1979);[4] and (b) that they be brief, *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824, 99 S.Ct. 2248 (1979).[5] As stated in *Sharpe v. United States*, 660 F. 2d 967, 970 (4th Cir. 1981), "the brevity requirement for investigatory stops predicated upon less than probable cause [is significant since] it is the transitory nature of the stop that justifies elimination of probable cause requirement."[6] This brevity requirement applies even when law

---

4. In *Brown v. Texas*, two police officers approached Brown as he was coming out of an alley in a "high drug problem area" and requested identification. When Brown refused to identify himself and angrily asserted that the officers had no right to stop him, he was frisked. The *Brown* Court said: "When the officers detained [Brown] for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the [reasonableness] requirements of the Fourth Amendment." 443 U.S. at 50, 61 L.Ed. 2d at 361, 99 S.Ct. at 2640.

5. Without probable cause, but with a reasonable suspicion of illegal conduct, the police seized Dunaway and transported him to the police station for questioning. The Court noted first that Dunaway would have been restrained if he had tried to leave, and second, that Dunaway was not questioned briefly. The Court held that the detention "was in important respects indistinguishable from a traditional arrest," 442 U.S. at 212, 60 L.Ed. 2d at 834-35, 99 S.Ct. at 2256, and found it an unconstitutional seizure since made on less than probable cause.

6. On the question of brevity, *compare Brignoni-Ponce* (border patrol investigatory stops justified on the grounds that the intrusions usually consume no more than one minute, and involve only a brief question or two) *and United States v. Vasquez-Santiago*, 602 F. 2d 1069 (2nd Cir. 1979), *cert. denied* 447 U.S. 911, 64 L.Ed. 2d 861, 100 S.Ct. 2998 (1980) (detention involving only a couple of minutes of

enforcement officers have a reasonable suspicion of criminality, and "any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. at 882, 45 L.Ed. 2d at 617, 95 S.Ct. at 2580.

The Supreme Court's statement in *Reid v. Georgia* aptly summarizes our analysis:

> The Fourth and Fourteenth Amendments' prohibition of searches and seizures that are not supported by some objective justification governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest. [Citations omitted.] While the court has recognized that in some circumstances a person may be detained briefly without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity. [Citations omitted.]

448 U.S. at 440, 65 L.Ed. 2d at 893-94, 100 S.Ct. at 2753. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result that this court has consistently refused to sanction." *Terry v. Ohio*, 392 U.S. at 22, 20 L.Ed. 2d at 906, 88 S.Ct. at 1880.

### III

With these general principles in mind, we turn to the facts of this case to determine if, during the initial encounter (when Grimmett 'was initially approached), Grimmett was "seized" within the meaning of the Fourth Amendment, or merely questioned.[7] The trial court found the following facts. Harkey approached Grimmett in a public area outside of the terminal, identified himself,

questioning in an airport on the basis of a reasonable and articulable suspicion of narcotics violation was not an unconstitutional intrusion) *with United States v. Chamberlin*, 644 F. 2d 1262 (9th Cir. 1980) (twenty-minute detention of individual in back of car without probable cause but upon a reasonable and articulable suspicion of criminality is unlawful).

7. Evidently, relying on *Reid v. Georgia*, "[t]he State concedes that at this point the officers lacked sufficient reasonable suspicion to conduct a 'Terry-type' seizure." (State's Brief, p. 8.) The State argues that no seizure took place during the initial encounter.

stated the purpose of his approach, and asked if Grimmett would talk with him. Grimmett first agreed to talk to Harkey, then subsequently agreed to accompany Harkey into the terminal. At no time did Harkey display a weapon or use physical force or contact or threaten Grimmett. Indeed, Grimmett himself testified: "*Everything* that Mr. Davis and Officer Harkey stated was rather smooth. They conducted themselves rather nicëly, I have to say that." Moreover, Harkey testified that if Grimmett had refused to talk to him, he would have had to let Grimmett go.

These facts, and the trial court's additional findings that Grimmett was not seized when the law enforcement officers initially approached him, are based on competent evidence and are conclusive on appeal. *State v. Thompson*, 296 N.C. 703, 252 S.E. 2d 776 (1979); *State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972); *State v. Cooke*, 54 N.C. App. 33, 282 S.E. 2d 800 (1981). Moreover, we are guided by the following language from *Terry v. Ohio*:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

392 U.S. at 19, n. 16, 20 L.Ed. 2d at 905, n. 16, 88 S.Ct. at 1879, n. 16. On the facts of this case, we find that no seizure occurred during the initial encounter.

## IV

It is necessary to determine if, at any time after the initial encounter, Grimmett was "seized" within the meaning of the Fourth Amendment since such a violation might taint the subsequent searches. As if quoting the dissenting opinion in *United States v. Mendenhall*, 446 U.S. at 574, 64 L.Ed. 2d at 522, 100 S.Ct. at 1887, Grimmett contends that

> [w]hatever doubt there may be concerning whether [his] Fourth Amendment interests were implicated during the initial stages of [his] confrontation with the [officer], [he] undoubtedly was "seized" within the meaning of the Fourth Amendment, when the agents escorted [him] from the public

area of the terminal to the . . . office for questioning and a strip search of [his] person.

On that point, the State argues "that further, more critical facts were uncovered following the officers' approach and conversation with [Grimmett]." For example, Grimmett's extreme nervousness and inability to identify himself are factors which, the State contends, provided the officers with sufficient articulable facts upon which to base a reasonable suspicion that Grimmett was engaged in criminal activity.

On the basis of *Reid v. Georgia*, we do not believe Harkey had a reasonable and articulable suspicion even considering the "further, more critical facts" urged upon us by the State. In *Reid v. Georgia*, "the petitioner appeared to the agent to fit the so-called 'drug courier profile' " and appeared nervous during the initial encounter. 448 U.S. at 440, 65 L.Ed. 2d at 894, 100 S.Ct. at 2753. The Court held that the agents could not have reasonably suspected the defendant of criminal activity based on the observed circumstances.

Although *Reid* is controlling on this narrow issue, it does not answer the further question: whether the further detention — the trip to the basement — was justifiable. *United States v. Mendenhall* now becomes helpful.

V

In *United States v. Mendenhall*, "[t]he district court specifically found that the respondent accompanied the agents to the office 'voluntarily in a spirit of apparent cooperation.' " 446 U.S. at 557, 64 L.Ed. 2d at 511, 100 S.Ct. at 1879, *quoting Sibron v. New York*, 392 U.S. 40, 63, 20 L.Ed. 2d 917, 935, 88 S.Ct. 1889, 1903 (1968). That finding was sustained by the record and binding on appeal. The same can be said about the case *sub judice*. The trial court found upon competent evidence that Harkey made a series of requests, to each of which the defendant assented. They consisted of his initial consent to talk to Harkey, his agreement to go inside the terminal, his assent to produce identification which was in Huss' luggage, and his consent to move with Harkey to the basement area of the terminal.

The evidence of consent to accompany Officer Harkey in this case was even stronger than the evidence of consent to accom-

pany the agents in *United States v. Mendenhall.*[8] The trial court in this case specifically found upon competent evidence that Grimmett consented to accompany Harkey to the basement.

## VI

In addition to its finding that Grimmett consented to accompany Harkey to the basement, the trial court found upon competent evidence that Grimmett consented to the search of the suitcase that contained his identification. The following facts found by the trial court are supported by competent evidence:

That Officer Harkey then asked defendant for tickets and identification; that defendant replied that further identification was in the suitcase which was in the possession of Huss; . . . [that] *the defendant opened the suitcase, at which time defendant was asked by Officer Harkey if he were carrying contraband; that the defendant replied, "No, go ahead and search the suitcase if you wish"*; that Officers Harkey and Davis began looking through the suitcase, discovered a .357 magnum pistol and Officer Davis discovered a tinfoil packet; that the defendant was then asked what it contained; that the defendant replied, "Crystal Meth," a street name for a controlled substance; that based on their experience the officers were of the opinion that the packet contained a controlled substance; that at this point, . . . defendant was placed under arrest for possession of a controlled substance; that following the arrest the officers immediately searched . . . Grimmett and found . . . strapped to his leg, a plastic bag with an off-white powdery substance having the appearance of cocaine, which was subsequently analyzed and determined to be cocaine.

Although Grimmett testified that he never consented to a search, the trial court specifically found and concluded that the search of the suitcase was with Grimmett's permission. Upon *voir dire* to determine the voluntariness of Grimmett's consent to a

---

8. The federal district court's suggestion that Ms. Mendenhall accompanied the agents to the office "voluntarily in a spirit of apparent cooperation" was based on fewer facts than we have in the case *sub judice*, and, therefore, the *Mendenhall* Court was required to do a much more thorough analysis than we are required to do to determine if the consent was in fact voluntary or the product of duress or coercion.

search of his property, the weight to be given the evidence is peculiarly a determination for the trial court, and his findings are conclusive when supported by competent evidence. *State v. Little*, 270 N.C. 234, 154 S.E. 2d 61 (1967). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed. 2d 854, 93 S.Ct. 2041 (1973).

Once Grimmett told Harkey that the substance in the suitcase was "Crystal Meth," Harkey had probable cause to, and did, arrest Grimmett. The subsequent search of Grimmett's person which uncovered the cocaine that is the subject of his lawsuit, was incident to a lawful arrest. *See Sibron v. New York.*

## VII

Grimmett finally contends that all of Harkey's questioning was conducted in a custodial atmosphere and while he was significantly deprived of his freedom without the benefit of *Miranda* warnings. *See Miranda v. Arizona.* Because we find that Grimmett not only consented to accompany Harkey to the basement but also consented to the search of the suitcase, we summarily reject Grimmett's argument that his statements, including his statement that "this is Crystal Meth" were tainted or were the fruits of unlawful police conduct.

For the reasons stated above, the Order of the trial court is

Affirmed.

Chief Judge MORRIS and Judge ARNOLD concur.